**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**TYLER HOLL**, on behalf of himself and all others similarly situated,

Plaintiff,

v.

**SUNSOURCE INC.**,

Defendant.

No. 1:26-cv-8309

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Tyler Holl ("Plaintiff"), through his attorneys, individually and on behalf of all others similarly situated, brings this class action Complaint against Defendant SunSource Inc. ("SunSource" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, and/or other related entities. Plaintiff alleges the following on information and belief—except as to his own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1. This class action arises from Defendant's failure to protect highly sensitive data.

2. Defendant is a manufacturing company that designs and distributes solutions for industrial machinery systems; fluid power, motion control, process, conveyance; industrial sales; and service & repair.[1]

3. As such, Defendant stores a litany of highly sensitive personal identifiable information ("PII") and protected health information ("PHI")—together "PII/PHI"—about its

[1] *About Us*, SUNSOURCE, https://www.sun-source.com/About-Us (last visited Jul. 14, 2026).

current and former employees. But Defendant lost control over that data when cybercriminals infiltrated its insufficiently protected computer systems in a data breach (the "Data Breach").

4. It is unknown for precisely how long the cybercriminals had access to Defendant's network before the breach was discovered. In other words, Defendant had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to its current and former employees' PII/PHI.

5. On information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII/PHI. In short, Defendant's failures placed the Class's PII/PHI in a vulnerable position—rendering them easy targets for cybercriminals.

6. Plaintiff is a Data Breach victim, and he brings this class action on behalf of himself, and all others harmed by Defendant's misconduct.

7. The exposure of one's PII/PHI to cybercriminals is a bell that cannot be unrung. Before this data breach, its current and former employees' private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

**PARTIES**

8. Plaintiff Tyler Holl is a natural person and a citizen of Illinois where he intends to remain.

9. Defendant SunSource Inc. is a corporation incorporated in Delaware, with its principal place of business at 2301 W. Windsor Court, Suite A, Addison, Illinois.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Members of the proposed Class and Defendant are citizens of different states. And there are over 100 putative Class Members.

11. This Court has personal jurisdiction over Defendant because it is headquartered in Illinois, regularly conducts business and has sufficient minimum contacts in Illinois.

12. Venue is proper in this Court because Defendant's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## BACKGROUND

***SunSource Collected and Stored the PII/PHI of Plaintiff and the Class***

13. SunSource is a manufacturing company that designs and distributes solutions for industrial machinery systems; fluid power, motion control, process, conveyance; industrial sales; and service & repair.[2]

14. SunSource operates over 240 locations throughout North America, "including more than 150 service, repair and fabrication centers."[3]

15. As part of its business, SunSource receives and maintains the PII/PHI of thousands of its current and former employees.

[2] *Id*.
[3] *Id*.

16. In collecting and maintaining the PII/PHI, SunSource agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiff and Class Members themselves took reasonable steps to secure their PII/PHI.

17. Under state and federal law, businesses like SunSource have duties to protect its current and former employees' PII/PHI and to notify them about breaches.

18. SunSource recognizes these duties, declaring in its "Privacy Policy" that:

a. "SunSource…. is committed to your privacy."[4]

b. "We will not disclose your personal information to third parties[.]"[5]

c. "We have implemented measures designed to secure your personal information from accidental loss and from unauthorized access, use, alteration, and disclosure."[6]

d. "Residents of states with consumer privacy laws can exercise their rights by contacting us"[7]

e. "When personal information is no longer reasonably necessary for the disclosed purpose, we will delete or deidentify it in accordance with applicable law."[8]

***Defendant's Data Breach***

19. Between March 31, 2026, and April 5, 2026, SunSource was hacked in the Data Breach.[9] A sample Notice of Data Breach is attached as Exhibit A.

---

[4] *Privacy Notice*, SUNSOURCE, https://www.sun-source.com/privacy-notice (last visited Jul. 14, 2026).
[5] *Id*.
[6] *Id*.
[7] *Id*.
[8] *Id*.
[9] *See* Exhibit A.

20. Worryingly, SunSource already admitted that "an unauthorized third party was briefly able to gain access to a limited part of our network… and gained access to certain files stored on a portion of our file server."[10]

21. Because of SunSource's Data Breach, at least the following types of PII/PHI were compromised:

a. Names;

b. Address;

c. Date of birth;

d. Driver's license number;

e. Government-issued ID number (e.g. passport, state ID card);

f. Financial Information (e.g. account number, credit or debit card number);

g. Health insurance information;

h. Medical information; and

i. Social Security number and/or tax identification number.

22. Upon information and belief, SunSource injured at least 12,463 persons—via the exposure of their PII/PHI—in the Data Breach. Upon information and belief, these 12,463 persons include its current and former employees.

23. And yet, SunSource waited until June 16, 2026, before it began notifying the class—a full 77 days after the Data Breach began.[11]

24. Thus, SunSource kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

---

[10] *See* Exhibit A.
[11] *Id*.

25. And when SunSource did notify Plaintiff and the Class of the Data Breach, SunSource acknowledged that the Data Breach created a present, continuing, and significant risk of suffering identity theft, warning Plaintiff and the Class:

a. "we recommend that you remain vigilant to protect against possible fraud and/or identity theft by, among other things, reviewing your account statements and monitoring credit reports closely;"

b. "If you detect any suspicious activity on an account, you should promptly contact your bank or the financial institution or company with which the account is maintained;" and

c. "You should also promptly report any fraudulent activity or any suspected incidents of identity theft to proper law enforcement authorities."[12]

26. SunSource failed its duties when its inadequate security practices caused the Data Breach. In other words, SunSource's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII/PHI. And thus, SunSource caused widespread injury and monetary damages.

27. Since the Data Breach, SunSource claims that it is "taking further steps to reduce the risk of this type of incident reoccurring, including reviewing our technical and security safeguards."[13]

28. But such simple declarations are insufficient to ensure that Plaintiff's and Class Members' PII/PHI will be protected from additional exposure in a subsequent data breach.

---

[12] *Id.*
[13] *Id.*

29. SunSource has done little to remedy its Data Breach. True, SunSource has offered some victims credit monitoring and identity related services. But upon information and belief, such services are wholly insufficient to compensate Plaintiff and Class Members for the injuries that SunSource inflicted upon them.

30. Because of SunSource's Data Breach, the sensitive PII/PHI of Plaintiff and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiff and Class Members.

***Payouts King & the Dark Web***

31. Worryingly, the cybercriminals that obtained Plaintiff's and Class Members' PII/PHI appear to be the notorious cybercriminal group "Payouts King."[14]

32. Upon information and belief, the cybercriminals in question are particularly sophisticated. After all, the cybercriminals: (1) defeated the relevant data security systems, (2) gained actual access to sensitive data, and (3) successfully accessed and acquired data.

33. Payouts King is an especially notorious cybercriminal group. In fact, Payouts King is known to use various techniques and tactics like "the combination of spam bombing, Microsoft Teams-based social engineering, and the abuse of the legitimate Windows tool Quick Assist" to attack victim's networks.[15] "Once a foothold is established on the victim's network, Payouts King deploys its ransomware payload, steals large volumes of sensitive data, and then selectively encrypts files."[16]

---

[14] *SunSource*, RANSOMWARE.LIVE, https://www.ransomware.live/id/U3VuU291cmNlQHBheW91dHNraW5n (last visited Jul. 14, 2026).

[15] Tushar Subhra Dutta, *Payouts King Rises as New Ransomware Threat Linked to Former BlackBasta Affiliates*, CYBER SECURITY NEWS (Apr. 17, 2026), https://cybersecuritynews.com/payouts-king-rises-as-new-ransomware-threat/

[16] *Id*.

34. Payouts King maintains a Data Leak Site ("DLS") on the dark web where it publishes stolen data in order to pressure organizations who were subject to a data breach.[17]

35. On or around April 20, 2026, Payouts King created a post on its dark web DLS announcing that it had hacked defendant.[18]




36. Payouts King's dark web post contained Defendant's name and logo, a link to Defendant's website, a description of Defendant's business, the words "Actions: Exfiltrated", "Data: 700GB", the number "24" next to an icon of an eye and a countdown reflecting "6d 23:11."

37. This indicates that Payouts King hacked Defendant's computer network, stole 700 gigabytes of the sensitive PII/PHI contained therein, and published the stolen PII/PHI on the dark web less than 7 days after the screenshot of the dark web post was taken.

38. Defendant's cyber and data security systems were completely inadequate in that it allowed cybercriminals to obtain files containing a treasure trove of thousands of its employees,' clients' and clients' lessees' highly sensitive PII.

---

[17] *Id.*

[18] A screen shot of Payouts King's dark web post was obtained from Ransomware.Live, an open-source project providing real-time ransomware intelligence. *See AboutRansoware.live,* RANSOMWARE.LIVE, https://www.ransomware.live/about (last visited Jul. 14, 2026).

39. And as the Harvard Business Review notes, such "[c]ybercriminals frequently use the dark web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[19]

40. On information and belief, Defendant has not made any public statements regarding Payouts King or whether it made a ransom payment.

41. As explained by the global cybersecurity firm BlackFog, the modus operandi of cybercriminals like Payouts King is to exfiltrate private information through a data breach and then "post it on forums on the Dark Web where it will be sold for profit."[20]

42. Indeed, the Federal Trade Commission has explained that "data stolen from businesses ends up on the dark web where criminals buy and sell it to commit fraud, get fake identity documents, or fund their criminal organizations."[21]

43. However, even if Defendant made a ransom payment, there is no guarantee that the PII stolen in the Data Breach will be deleted.[22] The stolen PII is valuable, and can easily be sold to another threat actor, so there is little incentive to delete it.[23]

---

[19] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.

[20] Brenda Robb, *After the Data Breach – What Happens to Your Data*, BlackFog (July 27, 2025) https://www.blackfog.com/after-the-data-breach-what-happens-to-your-data/.

[21] John Krebs, *The dark web: What your business needs to know*, Fed. Trade Comm. (Oct. 17, 2017) https://www.ftc.gov/business-guidance/blog/2017/10/dark-web-what-your-business-needs-know.

[22] Steve Adler, *Majority of Ransomware Victims That Pay a Ransom Suffer a Second Attack*, THE HIPAA JOURNAL (Feb. 23, 2024), https://www.hipaajournal.com/majority-of-ransomware-victims-that-pay-a-ransom-suffer-a-second-attack/.

[23] *Id*.

44. Thus, on information and belief, Plaintiff's and the Class's stolen PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

***Plaintiff's Experiences and Injuries***

45. Plaintiff Tyler Holl is a former employee of Defendant.

46. Thus, Defendant obtained and maintained Plaintiff's PII/PHI, including, but not limited to his name, address, phone number, Social Security number, date of birth and tax information.

47. As a result, Plaintiff was injured by Defendant's Data Breach.

48. Plaintiff is very careful about the privacy and security of his PII/PHI. He does not knowingly transmit his PII/PHI over the internet in an unsafe manner. He is careful to store any documents containing his PII/PHI in a secure location.

49. As a condition of his employment with Defendant, Plaintiff provided Defendant with his PII/PHI. Defendant used that PII/PHI to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII/PHI in order to obtain employment and payment for that employment.

50. Plaintiff provided his PII/PHI to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues/continue to maintain Plaintiff's PII/PHI and has a continuing legal duty and obligation to protect that PII/PHI from unauthorized access and disclosure.

51. Plaintiff reasonably understood that a portion of the funds derived from his employment would be used by Defendant to pay for adequate cybersecurity and protection of PII/PHI.

52. Thus, on information and belief, Plaintiff's PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

53. Through its Data Breach, Defendant compromised Plaintiff's PII/PHI.

54. Plaintiff has *already* suffered from identity theft and fraud—whereby earlier this month, he received a notification from Credit Karma informing him that his PII was found on the dark web.

55. Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendant directed data breach victims to take those steps in its Data Breach Notice.

56. And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam emails, text messages, and phone calls.

57. Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

58. Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

59. Plaintiff suffered actual injury from the exposure and theft of his PII/PHI—which violates his rights to privacy.

60. Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII/PHI. After all, PII/PHI is a form of intangible property—property that Defendant was required to adequately protect.

61. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff's PII/PHI right in the hands of criminals.

62. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try to mitigate his injuries.

63. Today, Plaintiff has a continuing interest in ensuring that his PII/PHI—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Consumers Prioritize Data Security***

64. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[24] Therein, Cisco reported the following:

a. "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[25]

b. "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[26]

---

[24] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited March 19, 2025).
[25] *Id*. at 3.
[26] *Id*.

c. 89% of consumers stated that "I care about data privacy."[27]

d. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[28]

e. 51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[29]

f. 75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[30]

***Plaintiff and the Proposed Class Suffered Common Injuries and Damages***

65. Because of Defendant's failure to prevent the Data Breach, Plaintiff and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a. loss of the opportunity to control how their PII/PHI is used;

b. diminution in value of their PII/PHI;

c. compromise and continuing publication of their PII/PHI;

d. out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

e. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identity theft and fraud;

---

[27] *Id*. at 9.
[28] *Id*.
[29] *Id*.
[30] *Id*. at 11.

f. delay in receipt of tax refund monies;

g. unauthorized use of their stolen PII/PHI; and

h. continued risk to their PII/PHI—which remains in Defendant's possession—and is thus at risk for future breaches so long as Defendant fails to take appropriate measures to protect the PII/PHI.

***Substantially Increased Risk of Identity Theft and Fraud***

66. Plaintiff and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

67. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201 (2013).

68. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id*.

69. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the dark web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

70. The "dark web" is an unindexed layer of the internet that requires special software or authentication to access.[31] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[32] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

71. The unencrypted PII/PHI of Plaintiff and Class Members has or will end up for sale on the dark web because that is the modus operandi of hackers. In addition, unencrypted and detailed PII/PHI may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the Plaintiff's and Class Members' PII/PHI.

72. Theft of Social Security numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of their SSN, and a new SSN will not be provided until after the victim has suffered the harm.

73. In particular, the theft of Social Security numbers—in combination with other PII/PHI (e.g., name, address, date of birth)—provides cybercriminals with a "skeleton key" to commit rampant fraud and identity theft.

74. For example, cybersecurity expert Jim Stickley explained to Time Magazine that "[i]f I have your name and your Social Security number, and you haven't gotten a credit freeze

---

[31] *What Is the Dark Web?*, EXPERIAN, https://www.experian.com/blogs/ask-experian/what-isthe-dark-web/ (last visited July 9, 2025).
[32] *Id.*

yet, you're easy pickings . . . With that, you can do whatever you want . . . You can become that person."[33] For context, Jim Stickley is a "penetration tester" who is employed by businesses "to infiltrate their systems in order to find flaws they can fix before the bad guys exploit them."[34]

75. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years later. An individual may not know that their Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

76. For example, on average, it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[35]

77. It is within this context that Plaintiff and all other Class Members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

78. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take

---

[33] Patrick L. Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME MAGAZINE (Aug. 5, 2019) https://time.com/5643643/capital-one-equifax-data-breach-social-security/.
[34] *Id.*
[35] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. SYSTEMICS, CYBERNETICS & INFORMATICS 9 (2019) http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

79. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

80. Identity thieves can also use an individual's personal data and PII/PHI to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant issued in the victim's name.[36]

81. One example of criminals piecing together bits and pieces of compromised PII/PHI to create comprehensive dossiers on individuals is called "Fullz" packages.[37] These dossiers are

---

[36] *Identity Theft and Your Social Security Number,* SOCIAL SECURITY ADMINISTRATION, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited July 9, 2025).

[37] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone

both shockingly accurate and comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of PII/PHI to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen PII/PHI with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

82. The development of "Fullz" packages means that the PII/PHI exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet. In other words, even if certain information, such as emails, phone numbers, or credit card numbers, may not be included in the PII/PHI stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class Members' stolen PII/PHI is being misused, and that such misuse is fairly traceable to the Data Breach.

83. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[38]

---

with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm,* KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

[38] *2019 Internet Crime Report* (Feb. 11, 2020) FED. BUREAU INTELLIGENCE, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited July 9, 2025).

84. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Yet, Defendant failed to rapidly report to Plaintiff and the Class that their PII/PHI was stolen. Defendant's failure to promptly and properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff's and Class Members' injuries by depriving them of the earliest ability to take appropriate measures to protect their PII/PHI and take other necessary steps to mitigate the harm caused by the Data Breach.

85. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

86. In addition to out-of-pocket expenses that can exceed thousands of dollars, and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII/PHI. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

87. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII/PHI. To protect themselves, Plaintiff and Class Members will need to remain vigilant for years or even decades to come.

***Defendant Knew—Or Should Have Known—of the Risk of a Data Breach***

88. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

89. In 2024, a record 3,158 data breaches occurred—exposing approximately

1,350,835,988 sensitive records (i.e., 211% increase year over year).[39]

90. Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[40]

91. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

***Defendant Could Have Prevented the Data Breach***

92. Data breaches are preventable.[41] Indeed, the American Bar Association published a treatise titled the *Data Breach and Encryption Handbook* wherein the author explained that:

a. "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[42]

b. "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[43]

---

[39] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.

[40] Ben Kochman, *FBI*, *Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[41] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (2012).

[42] *Id.* at 17.

[43] *Id.* at 28.

c. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures…[a]ppropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [44]

***Defendant Failed to Follow FTC Guidelines***

93. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

94. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[45] The FTC declared that, *inter alia*, businesses must:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

95. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

---

[44] *Id.*

[45] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

96. Furthermore, the FTC explains that companies must:

a. not maintain information longer than is needed to authorize a transaction;

b. limit access to sensitive data;

c. require complex passwords to be used on networks;

d. use industry-tested methods for security;

e. monitor for suspicious activity on the network; and

f. verify that third-party service providers use reasonable security measures.

97. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

98. In short, Defendant's failure to use reasonable and appropriate measures to protect against unauthorized access to its current and former employees' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

99. Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: (i) educating all employees; (ii) strong passwords; (iii) multi-layer security, including firewalls, anti-virus, and anti- malware software; (iv) encryption (making data unreadable without a key); (v) multi-factor authentication; (vi) backup data; and (vii) limiting which employees can access sensitive data.

100. Other industry standard best practices include: (i) installing appropriate malware detection software; (ii) monitoring and limiting the network ports; (iii) protecting web browsers and email management systems; (iv) setting up network systems such as firewalls, switches, and routers; (v) monitoring and protection of physical security systems; (vi) protection against any possible communication system; and (vii) training staff regarding critical points.

101. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

102. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

***Defendant Violated HIPAA***

103. HIPAA circumscribes security provisions and data privacy responsibilities designed to keep patients' medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[46]

[46] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

104. HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII/PHI and PHI is properly maintained.[47]

105. The Data Breach resulted from a combination of inadequacies showing Defendant failed to comply with safeguards mandated by HIPAA. Defendant's security failures include, but are not limited to:

a. failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

b. failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c. failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d. failing to ensure compliance with HIPAA security standards by Defendant's workforce in violation of 45 C.F.R. § 164.306(a)(4);

e. failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to

[47] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f. failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g. failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h. failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i. failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

106. Simply put, the Data Breach resulted from a combination of insufficiencies that demonstrate Defendant failed to comply with safeguards mandated by HIPAA regulations.

**CLASS ACTION ALLEGATIONS**

107. Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII/PHI was compromised in SunSource Inc.'s Data Breach that began in March 2026, including all those individuals who received notice of the Data Breach.

108. Excluded from the Class are Defendant, its affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

109. Plaintiff reserves the right to amend the class definition.

110. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

111. Ascertainability. All members of the proposed Class are readily ascertainable from information in Defendant's custody and control. After all, Defendant already identified some individuals and sent them data breach notices.

112. Numerosity. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least 12,463 members.

113. Typicality. Plaintiff's claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

114. Adequacy. Plaintiff will fairly and adequately protect the proposed Class's common interests. His interests do not conflict with Class Members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

115. Commonality and Predominance. Plaintiff's and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting

individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

a. if Defendant had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII/PHI;

b. if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. if Defendant was negligent in maintaining, protecting, and securing PII/PHI;

d. if Defendant breached contract promises to safeguard Plaintiff and the Class's PII/PHI;

e. if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f. if Defendant's Breach Notice was reasonable;

g. if the Data Breach caused Plaintiff and the Class injuries;

h. what the proper damages measure is; and

i. if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

116. Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendant would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for

their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

**FIRST CAUSE OF ACTION**
**Negligence**
**(On Behalf of Plaintiff and the Class)**

117. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

118. Plaintiff and the Class entrusted their PII/PHI to Defendant on the premise and with the understanding that Defendant would safeguard their PII/PHI, use their PII/PHI for business purposes only, and/or not disclose their PII/PHI to unauthorized third parties.

119. Defendant owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII/PHI in a data breach. And here, that foreseeable danger came to pass.

120. Defendant has full knowledge of the sensitivity of the PII/PHI and the types of harm that Plaintiff and the Class could and would suffer if their PII/PHI was wrongfully disclosed.

121. Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiff and Class Members' PII/PHI.

122. Defendant owed—to Plaintiff and Class Members—at least the following duties to:

a. exercise reasonable care in handling and using the PII/PHI in its care and custody;

b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

c. promptly detect attempts at unauthorized access;

d. notify Plaintiff and Class Members within a reasonable timeframe of any breach to the security of their PII/PHI.

123. Thus, Defendant owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their PII/PHI, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

124. Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII/PHI it was no longer required to retain under applicable regulations.

125. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII/PHI of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

126. Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential PII/PHI, a necessary part of obtaining services from Defendant.

127. Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff and Class Members' PII/PHI.

128. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII/PHI entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff and the Class Members' sensitive PII/PHI.

129. Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII/PHI and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII/PHI Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

130. Similarly, under HIPAA, Defendant had a duty to follow HIPAA standards for privacy and security practices—as to protect Plaintiff's and Class Members' PHI.

131. Defendant violated its duty under HIPAA by failing to use reasonable measures to protect its PHI and by not complying with applicable regulations detailed *supra*. Here too, Defendant's conduct was particularly unreasonable given the nature and amount of PHI that Defendant collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

132. The risk that unauthorized persons would attempt to gain access to the PII/PHI and misuse it was foreseeable. Given that Defendant hold vast amounts of PII/PHI, it was inevitable

that unauthorized individuals would attempt to access Defendant's databases containing the PII/PHI —whether by malware or otherwise.

133. PII/PHI is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII/PHI of Plaintiff and Class Members' and the importance of exercising reasonable care in handling it.

134. Defendant improperly and inadequately safeguarded the PII/PHI of Plaintiff and the Class in deviation from standard industry rules, regulations, and practices at the time of the Data Breach.

135. Defendant breached these duties as evidenced by the Data Breach.

136. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class Members' PII/PHI by:

a. disclosing and providing access to this information to third parties and

b. failing to properly supervise both the way the PII/PHI was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

137. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII/PHI of Plaintiff and Class Members, which actually and proximately caused the Data Breach and Plaintiff and Class Members' injury.

138. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class Members' injuries-in-fact.

139. Defendant has admitted that the PII/PHI of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

140. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

141. And, on information and belief, Plaintiff's PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

142. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII/PHI by criminals, improper disclosure of their PII/PHI, lost benefit of their bargain, lost value of their PII/PHI, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CAUSE OF ACTION
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

143. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

144. Plaintiff and Class Members were required to provide their PII/PHI to Defendant as a condition of receiving employment provided by Defendant. Plaintiff and Class Members provided their PII/PHI to Defendant in exchange for Defendant's employment.

145. Plaintiff and Class Members reasonably understood that a portion of the funds derived from their labor would be used to pay for adequate cybersecurity measures.

146. Plaintiff and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII/PHI that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

147. Plaintiff and the Class Members accepted Defendant's offers by disclosing their PII/PHI to Defendant in exchange for employment.

148. In turn, and through internal policies, Defendant agreed to protect and not disclose the PII/PHI to unauthorized persons.

149. In its Privacy Policy, Defendant represented that they had a legal duty to protect Plaintiff's and Class Member's PII/PHI.

150. Implicit in the parties' agreement was that Defendant would provide Plaintiff and Class Members with prompt and adequate notice of all unauthorized access and/or theft of their PII/PHI.

151. After all, Plaintiff and Class Members would not have entrusted their PII/PHI to Defendant in the absence of such an agreement with Defendant.

152. Plaintiff and the Class fully performed their obligations under the implied contracts with Defendant.

153. The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

154. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

155. Defendant materially breached the contracts it entered with Plaintiff and Class Members by:

a. failing to safeguard their information;

b. failing to notify them promptly of the intrusion into its computer systems that compromised such information.

c. failing to comply with industry standards;

d. failing to comply with the legal obligations necessarily incorporated into the agreements; and

e. failing to ensure the confidentiality and integrity of the electronic PII/PHI that Defendant created, received, maintained, and transmitted.

156. In these and other ways, Defendant violated its duty of good faith and fair dealing.

157. Defendant's material breaches were the direct and proximate cause of Plaintiff's and Class Members' injuries (as detailed *supra*).

158. And, on information and belief, Plaintiff's PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

159. Plaintiff and Class Members performed as required under the relevant agreements, or such performance was waived by Defendant's conduct.

**<u>THIRD CAUSE OF ACTION</u>**
**Invasion of Privacy**
**(On Behalf of Plaintiff and the Class)**

160. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

161. Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII/PHI and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

162. Defendant owed a duty to its current and former employees, including Plaintiff and the Class, to keep this information confidential.

163. The unauthorized acquisition (i.e., theft) by a third party of Plaintiff and Class Members' PII/PHI is highly offensive to a reasonable person.

164. The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class disclosed their sensitive and confidential information to Defendant, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

165. The Data Breach constitutes an intentional interference with Plaintiff's and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

166. Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

167. Defendant acted with a knowing state of mind when it failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

168. Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

169. As a proximate result of Defendant's acts and omissions, the private and sensitive PII/PHI of Plaintiff and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages (as detailed *supra*).

170. And, on information and belief, Plaintiff's PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

171. Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PII/PHI are still maintained by Defendant with their inadequate cybersecurity system and policies.

172. Plaintiff and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the PII/PHI of Plaintiff and the Class.

173. In addition to injunctive relief, Plaintiff, on behalf of himself and the other Class Members, also seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

174. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

175. This claim is pleaded in the alternative to the breach of implied contract claim.

176. Plaintiff and Class Members conferred a benefit upon Defendant. After all, Defendant benefited from (1) using their PII/PHI to facilitate employment, and (2) using their labor to derive profit.

177. Defendant appreciated or had knowledge of the benefits it received from Plaintiff and Class Members.

178. Plaintiff and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII/PHI that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

179. Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII/PHI.

180. Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

181. Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiff's and Class Members' (1) PII/PHI and (2) employment because Defendant failed to adequately protect their PII/PHI.

182. Plaintiff and Class Members have no adequate remedy at law.

183. Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiff and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

**FIFTH CAUSE OF ACTION**
**Violation of the Illinois Consumer Fraud and Deceptive Practice Act**
**815 ICLS 505/1, *et seq.***
**(On Behalf of Plaintiff and the Class)**

184. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

185. This claim is brought under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA").

186. Plaintiff and Class Members are "consumers" as defined in 815 Ill. Comp. Stat. § 505/1(e).

187. Plaintiff, the Class, and Defendant are "persons" as defined in 815 Ill. Comp. Stat. § 505/1(c).

188. The ICFA applies to Defendant because Defendant engaged in "trade" or "commerce," including the provision of services, as defined under 815 Ill. Comp. Stat. § 505/1(f). Defendant engages in the sale of "merchandise" (including services) as defined by 815 Ill. Comp. Stat. § 505/1(b) and (d).

189. Defendant violated ICFA by, *inter alia*:

a. failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class Members' PII/PHI, which was a direct and proximate cause of the Data Breach;

b. failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' PII/PHI, including

duties imposed by the FTC Act, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, *et seq*., which was a direct and proximate cause of the Data Breach;

d. omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Class Members' PII/PHI; and

e. omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' PII/PHI, including duties imposed by the FTC Act, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, *et seq*.

190. Defendant's omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of their PII/PHI.

191. Defendant intended to mislead Plaintiff and Class Members and induce them to rely on its omissions.

192. Had Defendant disclosed to Plaintiff and Class Members that its data systems were not secure—and thus vulnerable to attack—Defendant would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Defendant accepted the PII/PHI that Plaintiff and Class Members entrusted to it while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiff and Class Members acted reasonably in relying on Defendant's omissions, the truth of which they could not have discovered through reasonable investigation.

193. Defendant acted intentionally, knowingly, maliciously, and recklessly disregarded Plaintiff's and Class Members' rights.

194. As a direct and proximate result of Defendant's unfair and deceptive acts and practices, Plaintiff and Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII/PHI.

195. And, on information and belief, Plaintiff's PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

196. Plaintiff and Class Members seek all monetary and non-monetary relief allowed by law.

197. Defendant's wrongful practices were and are injurious to the public because those practices were part of Defendant's generalized course of conduct that applied to the Class. Plaintiff and the Class have been adversely affected by Defendant's conduct and the public was and is at risk as a result thereof.

198. Defendant also violated 815 ILCS 505/2 by failing to immediately notify Plaintiff and the Class of the nature and extent of the Data Breach pursuant to the Illinois PII Protection Act, 815 ILCS 530/1, *et seq*.

199. Pursuant to 815 Ill. Comp. Stat. § 505/10a(a), Plaintiff and the Class seek actual and compensatory damages, injunctive relief, court costs and attorneys' fees as a result of Defendant's violations of the ICFA.

## SIXTH CAUSE OF ACTION
**Declaratory Judgment**
**(On Behalf of Plaintiff and the Class)**

200. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

201. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

202. In the fallout of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiff alleges that Defendant's actions were—and *still* are—inadequate and unreasonable. And Plaintiff and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

203. Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

b. Defendant has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

c. Defendant breached, and continues to breach, its duties by failing to use reasonable measures to the data entrusted to it; and

d. Defendant breaches of its duties caused—and continues to cause—injuries to Plaintiff and Class Members.

204. The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it.

205. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences a second data breach.

206. And if a second breach occurs, Plaintiff and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiff and Class Members' injuries.

207. If an injunction is not issued, the resulting hardship to Plaintiff and Class Members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

208. An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiff, Class Members, and the public at large.

**PRAYER FOR RELIEF**

Plaintiff and Class Members respectfully request judgment against Defendant and that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing his counsel to represent the Class;

B. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

C. Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

D. Enjoining Defendant from further unfair and/or deceptive practices;

E. Awarding Plaintiff and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F. Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

G. Awarding attorneys' fees and costs, as allowed by law;

H. Awarding prejudgment and post-judgment interest, as provided by law;

I. Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J. Granting other relief that this Court finds appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial for all claims so triable.

Dated: July 14, 2026

Respectfully submitted,

By: */s/ Samuel J. Strauss*

Samuel J. Strauss
Raina C. Borrelli*
**STRAUSS BORRELLI PLLC**
One Magnificent Mile
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
raina@straussborrelli.com
sam@straussborrelli.com

**Pro hac vice forthcoming*

*Attorneys for Plaintiff and the Proposed Class*

# — EXHIBIT A —

POLSINELLI

2049 Century Park East, Suite 2900, Los Angeles, CA 90067 • (310) 556-1801

June 16, 2026

Pasha A. Sternberg
310-229-1335
psternberg@polsinelli.com

**VIA E-MAIL (ATTORNEYGENERAL@DOJ.NH.GOV)**
The Honorable John Formella
Attorney General of the State of New Hampshire
Office of the Attorney General
33 Capitol Street
Concord, New Hampshire 03301

**Re: Notice of a Security Incident**

To Whom It May Concern:

We represent SunSource Borrower LLC ("SunSource"), 2301 Windsor Court, Suite A, Addison, IL, 60101, in connection with a recent incident that may have involved the personal information of New Hampshire residents, and provide this notice on behalf of SunSource pursuant to N.H. REV. STAT. ANN. § 359-C:20(I)(b). While SunSource is notifying you of this incident, SunSource does not waive any rights or defenses relating to the incident, this notice, or the applicability of New Hampshire law on personal jurisdiction.

## NATURE OF THE INCIDENT

After discovering suspicious activity in a limited part of its network, SunSource began an initial internal investigation and worked to contain its network. It also engaged an outside third-party forensic expert to investigate the issue and confirm the security of its network. The investigation determined that between March 31, 2026 and April 5, 2026, an unknown third party accessed certain systems on the SunSource network and acquired certain files from those systems. SunSource reviewed the files and on May 27, 2026, determined that the files contained information pertaining to thirty (30) New Hampshire residents. The information involved included names, date of birth, health insurance information, medical information, Social Security number and/or tax identification number.

## NOTICE TO THE RESIDENTS

SunSource is mailing notification letters to individuals via USPS today, June 16, 2026. The notification letter describes the incident, provides information on protecting against potential fraud and identity theft, and includes an offer of complimentary credit monitoring services. SunSource

POLSINELLI



has also arranged for a toll-free, dedicated call line to assist in responding to inquiries regarding the incident. Enclosed is a sample of the notification letter.

## STEPS TAKEN RELATING TO THE INCIDENT

Upon learning of the issue, SunSource promptly took steps to contain the incident and to confirm that its network was secure. SunSource is undertaking efforts to reduce the risk of this type of incident from occurring in the future, including reviewing its technical security measures. Finally, as discussed above, SunSource has notified potentially involved New Hampshire residents and provided them information on how to protect against fraudulent activity and identity theft. SunSource also offered the individuals complimentary credit monitoring services.

## CONTACT INFORMATION

Please contact me if you have any questions or if I can provide you with any further information concerning this matter.

Best Regards,

Pasha A. Sternberg

Enclosures

SUNSOURCE

<<Return to Kroll>>
<<Return Address>>
<<City, State ZIP>>

<<FIRST_NAME>> <<MIDDLE_NAME>> <<LAST_NAME>> <<SUFFIX>>
<<ADDRESS_1>>
<<ADDRESS_2>>
<<CITY>>, <<STATE_PROVINCE>> <<POSTAL_CODE>>
<<COUNTRY>>

KROLL
SCAN TO ENROLL

<<Date>> (Format: Month Day, Year)

<<b2b_text_2 (NOTICE OF DATA BREACH/ NOTICE OF DATA INCIDENT)>>

Dear <<First_name>> <<Last_name>>:

SunSource Borrower, LLC ("SunSource") values and respects the privacy of your information, which is why we are advising you of an incident that involved some of your personal information. We want to make you aware of the incident, what happened, what information was involved, and the steps we are taking to address it.

**What Happened?** SunSource has learned that an unauthorized third party was briefly able to gain access to a limited part of our network. After discovering the incident, we hired an outside third-party forensic expert to investigate the issue and confirm the security of our network. That investigation determined that, between March 31, 2026 and April 5, 2026, the third party had access to our network and gained access to certain files stored on a portion of our file server.

**What Information Was Involved?** On May 4, 2026, we determined that the files contain some of your personal information, including your name, together with your <<b2b_text_1 (data elements)>>.

**What We Are Doing.** In addition to the steps described above, we are taking further steps to reduce the risk of this type of incident reoccurring, including reviewing our technical and security safeguards. Also, we have arranged for you to enroll in a complimentary one-year membership of identity monitoring services, if you would like to do so. This product helps enrollees detect possible misuse of their personal information and provides identity monitoring services focused on prompt identification and resolution of identity theft. This service is completely free to you. **For more information, including instructions on how to activate your complimentary membership, please refer to the enclosed information.**

**What You Can Do.** You can take advantage of the complimentary identity monitoring we are offering and protect yourself against possible identity theft or fraud by using the steps in the *Additional Important Information* section.

**For More Information.** We value the trust you place in us to protect your privacy and take this responsibility very seriously. We apologize for any inconvenience this incident might cause. For further information and assistance, please call [redacted] from 8:00 a.m. – 5:30 p.m. Central Time, Monday through Friday, excluding major US holidays. Please have your membership number ready.

Sincerely,

SunSource

Your identity monitoring services include Credit Monitoring, Fraud Consultation, and Identity Theft Restoration.

Visit **https://enroll.krollmonitoring.com** to activate and take advantage of your identity monitoring services.

*You have until **<<b2b_text_6 (activation deadline)>>** to activate your identity monitoring services.*

Membership Number: **<<Membership Number s_n>>**

For more information about Kroll and your Identity Monitoring services, you can visit info.krollmonitoring.com.

KROLL

TAKE ADVANTAGE OF YOUR IDENTITY MONITORING SERVICES

You have been provided with access to the following services from Kroll:

Triple Bureau Credit Monitoring

You will receive alerts when there are changes to your credit data at any of the three national credit bureaus—for instance, when a new line of credit is applied for in your name. If you do not recognize the activity, you'll have the option to call a Kroll fraud specialist, who will be able to help you determine if it is an indicator of identity theft. To receive credit services, you must be over the age of 18 and have established credit in the U.S., have a Social Security number in your name, and have a U.S. residential address associated with your credit file.

Fraud Consultation

You have unlimited access to consultation with a Kroll fraud specialist. Support includes showing you the most effective ways to protect your identity, explaining your rights and protections under the law, assistance with fraud alerts, and interpreting how personal information is accessed and used, including investigating suspicious activity that could be tied to an identity theft event.

Identity Theft Restoration

If you become a victim of identity theft, an experienced Kroll licensed investigator will work on your behalf to resolve related issues. You will have access to a dedicated investigator who understands your issues and can do most of the work for you. Your investigator will be able to dig deep to uncover the scope of the identity theft, and then work to resolve it.

**Additional Important Information**

As a precautionary measure, we recommend that you remain vigilant to protect against possible fraud and/or identity theft by, among other things, reviewing your account statements and monitoring credit reports closely. If you detect any suspicious activity on an account, you should promptly contact your bank or the financial institution or company with which the account is maintained. You should also promptly report any fraudulent activity or any suspected incidents of identity theft to proper law enforcement authorities, including the police and your state's attorney general, as well as the Federal Trade Commission ("FTC").

You may wish to review the tips provided by the FTC on fraud alerts, security/credit freezes, and steps you can take to avoid identity theft. For more information and to contact the FTC, please visit www.ftc.gov/idtheft or call 1-877-ID-THEFT (1-877-438-4338). You may also contact the FTC at Federal Trade Commission, 600 Pennsylvania Avenue, NW, Washington, DC 20580.

**Credit Reports:** By law, you may obtain a free copy of your credit report once every 12 months from each of the three national credit reporting agencies. The three national credit reporting agencies have also agreed to provide free weekly online credit reports. You can obtain your free credit report by visiting www.annualcreditreport.com, by calling toll-free 1-877-322-8228, or by completing an Annual Credit Report Request Form and mailing it to Annual Credit Report Request Service, P.O. Box 105281, Atlanta, GA 30348. You can print a copy of the request form at https://www.annualcreditreport.com/manualRequestForm.action. Alternatively, you may elect to purchase a copy of your credit report by contacting the three national credit reporting agencies. Contact information for the three national credit reporting agencies for the purpose of requesting a copy of your credit report or for general inquiries is as follows:

| | | |
|---|---|---|
| Equifax | Experian | TransUnion |
| 1-866-349-5191 | 1-888-397-3742 | 1-800-888-4213 |
| www.equifax.com | www.experian.com | www.transunion.com |
| P.O. Box 740241 | P.O. Box 2002 | P.O. Box 2000 |
| Atlanta, GA 30374 | Allen, TX 75013 | Chester, PA 19016 |

**Fraud Alerts:** By law, you have the right to place a fraud alert on your credit report if you believe you have been, or are about to become, a victim of fraud or related crime. A fraud alert is free and will stay on your credit report for one (1) year. The alert informs creditors of possible fraudulent activity within your report and requests that the creditor contact you prior to establishing any new accounts in your name. To place a fraud alert on your credit report, contact any of the three national credit reporting agencies using the contact information listed above. Additional information is available at www.annualcreditreport.com/protectYourIdentity.action.

**Credit and Security Freezes:** By law, you have the right to place a credit freeze, also known as a security freeze, on your credit file, so that no new credit can be opened in your name without the use of a PIN number that is issued to you when you initiate the freeze. A credit freeze is designed to prevent potential credit grantors from accessing your credit report without your consent. If you place a credit freeze, potential creditors and other third parties will not be able to get access to your credit report unless you temporarily lift the freeze. Therefore, using a credit freeze may delay your ability to obtain credit. Unlike a fraud alert, you must separately place a credit freeze on your credit file at each credit reporting company. Since the instructions for how to establish a credit freeze differ from state to state, please contact the three major credit reporting companies as specified below to find out more information:

| | | |
|---|---|---|
| Equifax Security Freeze | Experian Security Freeze | TransUnion Security Freeze |
| 1-888-298-0045 | 1-888-397-3742 | 1-888-909-8872 |
| https://www.equifax.com/personal/credit-report-services/credit-freeze/ | https://www.experian.com/freeze/center.html | https://www.transunion.com/credit-freeze |
| P.O. Box 105788 | P.O. Box 9554 | P.O. Box 160 |
| Atlanta, GA 30348 | Allen, TX 75013 | Woodlyn, PA 19094 |

This notification was not delayed by law enforcement.

**Iowa Residents**: Iowa residents can contact the Office of the Attorney General to obtain information about steps to take to avoid identity theft from the Iowa Attorney General's office at: Office of the Attorney General of Iowa, Hoover State Office Building, 1305 E. Walnut Street, Des Moines IA 50319, 515-281-5164.

**Maryland Residents**: Maryland residents can contact the Office of the Attorney General to obtain information about steps you can take to avoid identity theft from the Maryland Attorney General's office at: Office of the Attorney General, 200 St. Paul Place, Baltimore, MD 21202, (888) 743-0023, http://www.marylandattorneygeneral.gov/. SunSource's main address and telephone number are 2301 Windsor Court, Suite A, Addison, IL, 60101, and (888) 786-7723.

**New Mexico Residents:** Individuals have rights under the Fair Credit Reporting Act. We encourage you to review your rights under the Fair Credit Reporting Act by visiting https://files.consumerfinance.gov/f/documents/bcfp_consumer-rights-summary_2018-09.pdf, or by requesting information in writing from the Consumer Financial Protection Bureau, 1700 G Street N.W., Washington, DC 20552.

**New York State Residents:** New York residents can obtain information about preventing identity theft from the New York Attorney General's Office at: Office of the Attorney General for the State of New York, Bureau of Consumer Frauds & Protection, The Capitol, Albany, New York 12224-0341; https://ag.ny.gov/consumer-frauds/identity-theft; (800) 771-7755.

**North Carolina Residents**: North Carolina residents can obtain information about preventing identity theft from the North Carolina Attorney General's Office at: North Carolina Attorney General's Office, Consumer Protection Division, 9001 Mail Service Center, Raleigh, NC 27699-9001; 877-5-NO-SCAM (Toll-free within North Carolina); 919-716-6000; www.ncdoj.gov.

**Oregon Residents**: Oregon residents are advised to report any suspected identity theft to law enforcement, including the Federal Trade Commission and the Oregon Attorney General. Oregon residents can contact the Oregon Attorney General at 1162 Court St. NE, Salem, OR 97301-4096; 503-378-4400; https://www.doj.state.or.us/.

**Rhode Island Residents**: <<b2b_text_3 (We believe that this incident affected [___] Rhode Island residents.)>> Rhode Island residents can contact the Office of the Attorney General at: Rhode Island Office of the Attorney General, 150 South Main Street, Providence, RI 02903, (401) 274-4400, www.riag.ri.gov. You have the right to obtain any police report filed in regard to this incident. If you are the victim of identity theft, you also have the right to file a police report and obtain a copy of it.